AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
## for the
### Central District of California

LODGED
CLERK, U.S. DISTRICT COURT
11/04/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: ASI   DEPUTY

FILED
CLERK, U.S. DISTRICT COURT
11/04/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: CGM   DEPUTY

United States of America

v.

JOE ABRAHAMSON,

Defendant

Case No.   2:24-mj-06705-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of September 6, 2024, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2423(b) | Travel with Intent to Engage in Illicit Sexual Conduct |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Chelsea Malone
*Complainant's signature*

Chelsea Malone, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: November 4, 2024

*Judge's signature*

City and state: Los Angeles, California

Hon. A. Joel Richlin, U.S. Magistrate Judge
*Printed name and title*

AUSA: Derek R. Flores (x4896)

**AFFIDAVIT**

I, Chelsea Malone, being duly sworn, declare and state as follows:

## I. INTRODUCTION

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since April 2022. As a Special Agent, I have conducted and participated in many investigations into criminal activity. I have executed and participated in the execution of search warrants and arrest warrants, and I have seized evidence of violations of federal and state law. In my current position, I investigate crimes involving the sexual exploitation of children in the Central District of California and associated violations of federal law.

2. I have received training in the investigation and prosecution of child pornography and child exploitation offenses. Through my training and experience, I am familiar with the methods used by people who commit offenses involving the sexual exploitation of children. My training and experience have given me an understanding of how people who commit offenses relating to the sexual exploitation of children use the Internet and digital devices to facilitate, commit, and conceal evidence of those offenses.

## II. PURPOSE OF AFFIDAVIT

3. This affidavit is made in support of a criminal complaint against JOE ABRAHAMSON ("ABRAHAMSON") (date of birth: June 5, 2002), for a violation of Title 18, United States Code,

Section 2423(b) (Travel with Intent to Engage in Illicit Sexual Conduct) (the "SUBJECT OFFENSE").

4.  The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates and times are on or about those indicated.

### III. BACKGROUND ON CHILD EXPLOITATION OFFENSES, COMPUTERS, THE INTERNET, AND DEFINITION OF TERMS

5.  In this affidavit, the terms "minor," "sexually explicit conduct," "visual depiction," "producing," and "child pornography" are defined as set forth in 18 U.S.C. § 2256. The term "computer" is defined as set forth in 18 U.S.C. § 1030(e)(1).

6.  Based upon my training and experience in the investigation of child pornography offenses, and information related to me by other law enforcement officers involved in the investigation of child pornography offenses, I know the following information about the use of computers with child pornography:

    a.  <u>Computers and Child Pornography</u>. Computers and computer technology have revolutionized the way in which child

pornography is produced, distributed, and utilized. Child pornographers can now produce both still and moving images directly from a common video camera and can convert these images into computer-readable formats. The use of digital technology has enabled child pornographers to electronically receive, distribute, and possess large numbers of child exploitation images and videos with other Internet users worldwide.

        b.   <u>File Storage</u>. Computer users can choose their method of storing files: either on a computer's hard drive, an external hard drive, a memory card, a USB thumb drive, a smart phone or other digital media device, etc. (i.e., "locally") or on virtual servers accessible from any digital device with an Internet connection (i.e., "cloud storage"). Computer users frequently transfer files from one location to another, such as from a phone to a computer or from cloud storage to an external hard drive. Computer users also often create "backup," or duplicate, copies of their files. In this way, digital child pornography is extremely mobile and such digital files are easily reproduced and transported. For example, with the click of a button, images and videos containing child pornography can be put onto external hard drives small enough to fit onto a keychain. Just as easily, these files can be copied onto compact disks and/or stored on mobile digital devices, such as smart phones and tablets. Furthermore, even if the actual child pornography files are stored on a "cloud," files stored in this manner can only be accessed via a digital device. Therefore, viewing this child pornography would require a computer,

smartphone, tablet, or some other digital device that allows the user to access and view files on the Internet.

   c. <u>Internet</u>. The term "Internet" is defined as the worldwide network of computers -- a noncommercial, self-governing network devoted mostly to communication and research with roughly 500 million users worldwide. The Internet is not an online service and has no real central hub. It is a collection of tens of thousands of computer networks, online services, and single user components. In order to access the Internet, an individual computer user must use an access provider, such as a university, employer, or commercial Internet Service Provider ("ISP"), which operates a host computer with direct access to the Internet.

   d. <u>Internet Service Providers</u>. Individuals and businesses obtain access to the Internet through ISPs. ISPs provide their customers with access to the Internet using telephone or other telecommunications lines; provide Internet e-mail accounts that allow users to communicate with other Internet users by sending and receiving electronic messages through the ISPs' servers; remotely store electronic files on their customer's behalf; and may provide other services unique to each particular ISP. ISPs maintain records pertaining to the individuals or businesses that have subscriber accounts with them. Those records often include identifying and billing information, account access information in the form of log files, e-mail transaction information, posting information,

account application information, and other information both in computer data and written record format.

### IV. TRAINING & EXPERIENCE ON THE BEHAVIOR OF INDIVIDUALS WHO SEXUALLY EXPLOIT CHILDREN

7. Based on my training and experience, and the training and experience of other law enforcement officers experienced in investigating crimes involving the sexual exploitation of children with whom I have had discussions, I have learned that individuals who view images of child pornography are often individuals who have a sexual interest in children and in images of children, and that there are certain characteristics common to such individuals:

    a. Individuals who have a sexual interest in children or images of children may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or in other visual media, or from literature describing such activity.

    b. Individuals who have a sexual interest in children or images of children typically maintain such images in digital or electronic format, and often maintain possession of these items for long periods of time and keep their collections in a safe, secure, and private environment, such as on digital devices. These collections are often kept close by, usually at the collector's residence or inside the collector's vehicle, to

enable the individual to readily view the collection, which is valued highly.

   c. Individuals who have a sexual interest in children or images of children also may correspond with and/or meet others to share information and materials (including through digital distribution via the Internet); rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

   d. Child pornography received via computer is extremely mobile. Through computer technology, digital files are easily reproduced and transported. For example, with the click of a button, images and videos containing child pornography can be put onto thumb drives so small that they fit onto a keychain. Just as easily, these files can be copied onto compact disks, and/or stored on cellular telephones.

   e. Individuals who have a sexual interest in children or images of children also may correspond with and/or meet others to share information and materials; may conceal such correspondence as they do their sexually explicit material; and may often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share a sexual interest in children.

6

    f. Individuals who have a sexual interest in children or images of children typically prefer not to be without child pornography for prolonged periods of time. This behavior has been documented by law enforcement officers involved in the investigation of child pornography offenses throughout the world.

V. <u>**SUMMARY OF PROBABLE CAUSE**</u>

  8. ABRAHAMSON is a 22-year-old who resides in Seattle, Washington. Minor Victim 1 ("MV1") is a 15-year-old who resides with her family in Simi Valley, California.

  9. ABRAHAMSON met MV1 online on TikTok in or around July 2024. ABRAHAMSON and MV1 then moved their conversations to other platforms, including emails, text messages, and FaceTime videocalls. In these conversations, MV1 told ABRAHAMSON that she was 15 years old. During their FaceTime videocalls, ABRAHAMSON took FaceTime photos of MV1 engaged in sexual activity, including photos showing MV1's naked breasts, genitalia, and buttocks. During this time, ABRAHAMSON also repeatedly messaged MV1 about sexual acts; for example, he described "pressing into your clit" and "I think about your clit on my tongue so much it's embarrassing."

  10. On September 6, 2024, ABRAHAMSON flew on a Delta Air Lines flight from Seattle to Los Angeles and met MV1 that afternoon at a hotel in Santa Clarita, California. At the hotel, ABRAHAMSON penetrated MV1's vagina with his mouth, his hand, and a strap-on dildo. On a FaceTime videocall prior to the trip, ABRAHAMSON showed MV1 that he was packing the strap-on dildo in

7

his luggage. While in the hotel room, ABRAHAMSON took pictures of himself and MV1, including a picture appearing to show them about to kiss and another picture of them hugging while MV1 was naked but with only her back visible in the picture. ABRAHAMSON also video recorded the sexual activity between himself and MV1.

11. On October 3, 2024, MV1 reported to the Simi Valley Police Department that ABRAHAMSON had sexually assaulted her. The next day, MV1 told ABRAHAMSON that she had informed the police about ABRAHAMSON. ABRAHAMSON messaged back, "I can say I didn't know your age but I'm, sure you told them you told me right."

## VI. STATEMENT OF PROBABLE CAUSE

12. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A. MV1 Reports to Law Enforcement that ABRAHAMSON Traveled from Washington to California and Sexually Assaulted Her**

13. On or about October 7, 2024, I received an email from B.M., the father of MV1, who stated that he was contacting the FBI regarding the sexual assault of his 15-year-old daughter, MV1. In his email, B.M. wrote that on or about October 3, 2024, MV1 had given a statement at the Simi Valley Police Department regarding a 22-year-old, later identified as Joe Abrahamson ("ABRAHAMSON"). B.M. wrote that he did not know all the details, but that MV1 had told him that the adult (i.e., ABRAHAMSON) had traveled from Seattle, Washington to Santa Clarita, California and sexually assaulted MV1 on or about September 6, 2024.

8

14. According to Simi Valley Police Report #24-39360, which was dated October 3, 2024:[1]

    a. MV1 met ABRAHAMSON online approximately three months prior to her report to the Simi Valley Police Department (i.e., in or around July 2024).

    b. MV1 informed ABRAHAMSON that she was 15 years old.

    c. MV1 and ABRAHAMSON sent sexually explicit messages to each other and engaged in sexually explicit videocalls.

    d. On or about September 6, 2024, ABRAHAMSON traveled from the State of Washington to the State of California for the purposes of engaging in sexual activity with MV1.

    e. ABRAHAMSON booked a hotel room at the Hyatt Regency Valencia in Santa Clarita, California where he and MV1 stayed the night.

    f. ABRAHAMSON arranged for an Uber to pick up MV1 from her school and transport her to the hotel. MV1 arrived at

---

[1] This police report misspelled ABRAHAMSON's last name as "Abrahanson" and also stated that ABRAHAMSON's date of birth was June 5, 2002, and that he had a residence in Shoreline, Washington (a suburb of Seattle). I submitted "Joe Abrahanson" (as it was spelled in the police report) with the June 5, 2002, date of birth and the Shoreline, Washington address (listed in the police report as his residence) to FBI personnel to search in law enforcement databases for that person. According to FBI personnel who conduct these database searches, when a name is searched the response can include people with similar names. Based on the information that I provided above, FBI personnel then sent a query to FBI personnel in Seattle, Washington for "Joe Abrahamson" with the date of birth June 5, 2002. That resulted in the confirmation that ABRAHAMSON's last name is "Abrahamson" and not "Abrahanson." MV1 also stated that ABRAHAMSON's name was "Joe Abrahamson."

9

the hotel at approximately 3:50 PM on or about September 6, 2024.

      g. At the hotel, ABRAHAMSON provided MV1 with alcohol and cannabis. ABRAHAMSON and MV1 then engaged in sexual activity, during which ABRAHAMSON penetrated MV1 with his tongue, fingers, and a sex toy. ABRAHAMSON recorded the sexual activity on MV1's cellphone.[2]

      h. ABRAHAMSON and MV1 checked out of the hotel between approximately 11:00 AM - 12:00 PM on or about September 7, 2024. ABRAHAMSON then took several buses back to LAX airport, after which he took a flight back to Washington.

      i. ABRAHAMSON and MV1 continued their relationship until approximately 2 weeks after the above-described meeting in Santa Clarita, California.

15. On or about October 16, 2024, B.M. provided consent to me for the FBI to seize and search MV1's phone.

16. On or about October 18, 2024, an FBI Child Forensic Interview Specialist interviewed MV1 while I was present in another room watching a livestream of the interview.

17. On or about October 22, 2024, B.M. provided consent to me for the FBI to access and search MV1's e-mail account. B.M. also provided consent for the FBI to assume MV1's identity using her email account.

---

[2] During a subsequent interview with MV1, MV1 stated that the sex toy was a strap-on dildo and that ABRAHAMSON recorded the sexual activity on both his cell phone and MV1's cell phone.

**B. ABRAHAMSON Had a Sexual Relationship with MV1**

**1. ABRAHAMSON Meets MV1 Online and Begins Sending MV1 Sexually Explicit Messages**

18. Based on my observation of MV1's October 18, 2024 interview, I know that MV1 stated the following during the interview:

    a. MV1 met ABRAHAMSON on TikTok. MV1 and ABRAHAMSON then began to frequently talk on FaceTime videocalls. Based on my review of MV1's cellphone and email account, they also appeared to communicate over text messages and email.

    b. During the FaceTime videocalls with ABRAHAMSON, MV1 engaged in sexual activity on camera. MV1 saw notifications on her phone indicating that ABRAHAMSON had taken FaceTime photos of MV1 during the FaceTime videocall, which included photos of MV1's naked breasts, genitalia, and buttocks.

19. MV1 maintained an email account whose address included her nickname and last name (as noted above, MV1's father provided consent for the FBI to search this email account). Based on my review of that account, MV1 used this email account to exchange sexually explicit messages with an email account that appeared to be associated with ABRAHAMSON, i.e., joealsschool@gmail.com.[3] Those email messages included the

---

[3] According to records obtained from Google, the subscriber for this account is "Joe Abrahamson," the recovery email is joealsbusiness@gmail.com, and the recovery phone number is (206) 530-9195 (the "-9195 number"). The joealsbusiness@gmail.com email address is the same email address that is listed for ABRAHAMSON in the United Air Lines records discussed below. Based on my review of records from CLEAR, a law enforcement and open-source database, the -9195 number appears to be a phone

*(footnote cont'd on next page)*

following messages that appeared to have been sent from ABRAHAMSON to MV1 on or about August 16, 2024:[4]

     a.   "i want you."

     b.   "you're. Mine. you're body mind and soul. Mine."

     c.   "i'll carve it into you until I kill you if that's what it takes. all. mine."

     d.   "nervous? you should be."

     e.   "you're everything to me, baby"

     f.   "pressing into your clit."

     g.   "look at me.", "fucking look at me."

     h.   "are you going to be a good girl for me/"

     i.   "don't tease without a taste, my dear."

     j.   "you'll learn the molecular model of blood, firsthand, at your own expense."

     k.   "I'll show you what it means to bleed."

     l.   "you're the holiest thing I know."

     m.   "good. Girl. My good girl…."

     n.   "take. It."

     o.   "you cant take it, can you? Sorry, i don't care."

     p.   "flicking. Licking. Fucking."

     q.   "feel my tongue on your skin? on your lips? your tongue? clit?"

---

number that was previously associated with ABRAHAMSON. However, T-Mobile was unable to provide a subscriber for the -9195 number for the period of July 2024 to October 2024.

[4] MV1 told the FBI that on or around October 4, 2024, she had deleted messages between her and ABRAHAMSON to protect him. The FBI was able to recover some of the pre-October 4, 2024 exchanges between ABRAHAMSON and MV1 from MV1's phone.

    r. "i love you. i whisper as I make you cum. and again. and again."

    s. "i need you I need you Lemon please jesus."[5]

    t. "your wet down my fucking throat."

    u. "I think about your clit on my tongue so much it's embarrassing."

20. During her October 18, 2024 interview with the FBI, MV1 stated that ABRAHAMSON had asked MV1 to be his girlfriend sometime prior to the start of MV1's school year.

  2. <u>ABRAHAMSON Visits MV1 in September and Sexually Assaults Her</u>

21. During her October 18, 2024 interview with the FBI, MV1 stated that ABRAHAMSON obtained a job for the purposes of earning money to travel to California to have sex with MV1. ABRAHAMSON got his first paycheck early, on September 5, 2024, and immediately booked the trip for September 6, 2024. ABRAHAMSON booked all the arrangements for the trip, including his flight, a hotel reservation at the Hyatt Regency Valencia in Santa Clarita, California, and an Uber to pick up MV1 from her school to transport her to the hotel.

22. According to records obtained from Delta Air Lines, I learned that on September 6, 2024, ABRAHAMSON flew from the Seattle-Tacoma International Airport (SEA) to the Los Angeles International Airport (LAX) on Delta Air Lines Flight 1628.

---

[5] "Lemon" was the nickname that ABRAHAMSON called MV1.

23. According to records obtained from the Hyatt Regency Valencia, I learned that ABRAHAMSON stayed in room 236 at the hotel between September 6 and 7, 2024.[6]

24. During her October 18, 2024 interview with the FBI, MV1 also stated the following:

    a. On or about September 6, 2024, MV1 took an Uber to the hotel and arrived at around 3:50 PM. At the hotel, ABRAHAMSON provided MV1 with alcohol and cannabis.

    b. In the hotel room, ABRAHAMSON penetrated MV1's vagina with his mouth, hand, and a strap-on dildo. ABRAHAMSON took videos of himself and MV1 engaging in this sexual activity on both his phone and MV1's phone.[7] Additionally, during a FaceTime videocall prior to the trip, ABRAHAMSON showed MV1 that he was packing a strap-on dildo in his luggage.

    c. In the hotel room, ABRAHAMSON also took photographs of MV1 and ABRAHAMSON that ABRAHAMSON later sent to MV1.

25. During my review of MV1's phone, I found two of the photographs that ABRAHAMSON took on or about September 7, 2024. One of the photographs was of MV1 and ABRAHAMSON on the hotel bed, appearing as though they were about to kiss. Another

---

[6] As part of the investigation, I visited this room and saw that the wall-mounted mirror, headboard, bedding, and lamp in room 236 matched the photographs that ABRAHAMSON took in this room on or about September 6, 2024, and sent to MV1, as described in paragraph 25.

[7] MV1 stated that she deleted the videos from her cellphone after she broke up with ABRAHAMSON. She also said that ABRAHAMSON told her that he deleted the videos from his phone as well, but MV1 did not know whether that was true.

photograph was of ABRAHAMSON hugging MV1 while she was nude with only her back visible in the image.[8]

26. During her October 18, 2024 interview with the FBI, MV1 stated that ABRAHAMSON and MV1 also walked to a Target and 85°C Bakery Café that were across the street from the hotel during their stay. Based on my review of screenshots from 85°C Bakery Café's security cameras from September 7, 2024, I observed two individuals together at the café who appeared to be ABRAHAMSON and MV1.[9]

27. Based on my review of records obtained from Snap Inc., I learned that ABRAHAMSON accessed Snapchat from an IP address that resolved to the Hyatt Regency Valencia on September 6-7, 2024.

28. Based on my review of records from Delta Air Lines, I learned that ABRAHAMSON was scheduled to return to SEA from LAX on September 7, 2024, but missed his flight. Annotations in Delta Air Line's records indicated that ABRAHAMSON told Delta Air Lines staff that there was a problem with his reservation but could not explain why he missed the flight. Delta Air Lines

---

[8] MV1 positively identified the photographs as being of her and ABRAHAMSON at the Hyatt Regency Valencia in Santa Clarita. MV1 indicated that the photo of her hugging ABRAHAMSON was following a trip to the hotel pool. She further confirmed that she was nude at the time the photograph was taken.

[9] The FBI also attempted to obtain records from Target, but Target was unable to provide security camera recordings from that date.

directed ABRAHAMSON to contact Expedia where he had booked the ticket.[10]

29. During her October 18, 2024 interview with the FBI, MV1 stated that, approximately two weeks after ABRAHAMSON's trip to Santa Clarita, ABRAHAMSON and MV1 ended their relationship.

### 3. ABRAHAMSON Admits that He Knew MV1 Was a Minor

30. Based on my review of MV1's phone, on or about October 4, 2024, MV1 texted ABRAHAMSON that she had filed a report with the police. ABRAHAMSON then texted MV1 the following:

    a. "I can say I didn't know your age but I'm sure you told them you told me right";

    b. "God I'm fucked"; and

    c. "Also because it was across state lines it's one of the biggest felonies so".

### 4. ABRAHAMSON Visits MV1 Again in October

31. Based on my review of records from United Airlines, I learned that on October 11, 2024, ABRAHAMSON flew from SEA to LAX on United Airlines Flight 1214. United Airlines records also listed ABRAHAMSON's email address as joealsbusiness@gmail.com, (as noted above, this was the recovery email address for ABRAHAMSON's joealsschool@gmail.com account, which he used to communicate with MV1).

32. Based on my review of records from Hyatt, I learned that a Hyatt security camera recording from October 11, 2024, showed ABRAHAMSON appearing to attempt to check in at the Hyatt

---

[10] The FBI is in the process of obtaining airline records to determine which flight ABRAHAMSON took from Los Angeles to Seattle.

Regency Valencia. According to Hyatt staff, ABRAHAMSON had a reservation for that date but was not permitted to check into the hotel because he was unable to provide a payment card for incidentals.

33. Based on my review of MV1's phone, I learned that ABRAHAMSON had emailed MV1 a shared Airbnb itinerary for a "4 BR Charming Retreat Near Burbank Airport" for October 11-13, 2024. That email appeared to indicate that ABRAHAMSON had booked the Airbnb and was in communication with the Airbnb host.[11]

34. During her October 18, 2024 interview with the FBI, MV1 stated the following:

    a. ABRAHAMSON's trip to California on or about October 11, 2024, was not pre-planned, and ABRAHAMSON had told her that he accidentally booked the trip because his finger slipped. MV1 encouraged ABRAHAMSON to cancel the trip but ABRAHAMSON got upset at her for her reaction.

    b. On the night of October 11, 2024, MV1 snuck out of her house to meet with ABRAHAMSON. ABRAHAMSON and MV1 then drove in MV1's sister's car from MV1's house towards the Airbnb that ABRAHAMSON had booked. On the way to the Airbnb, MV1's sister contacted her and told her that her family knew that MV1 had snuck out. ABRAHAMSON then dropped MV1 off at a nearby 7-Eleven and returned MV1's sister's car sometime later.

---

[11] On or about October 22, 2024, I searched Airbnb for this rental listing and found an advertisement posted for the listing. During this search, I also saw that a user with the name "Joe" (i.e., ABRAHAMSON's first name) and a profile photo resembling ABRAHAMSON had posted a review of this Airbnb listing, which indicated that he had stayed at the Airbnb listing.

35. Based on my review of records obtained from Snap Inc., I learned that ABRAHAMSON accessed Snapchat from IP addresses that resolved to the Los Angeles area on October 11-13, 2024.

36. Based on my review of records obtained from United Airlines, I learned that on October 13, 2024, ABRAHAMSON flew from LAX to SEA on United Airlines Flight 2220.

37. During her October 18, 2024 interview with the FBI, MV1 stated that the last time she had been in contact with ABRAHAMSON was on October 16, 2024, prior to her phone being reviewed by the FBI. MV1 also expressed concerns that ABRAHAMSON had overdosed on a videocall with her before. MV1 also recalled ABRAHAMSON getting angry when she told him about a minor that she was romantically interested in. MV1 also stated that ABRAHAMSON had punched a hole in his wall and blamed her for it. MV1 also said that ABRAHAMSON had been fired from the job that he had obtained in order to earn money to travel to visit MV1.

//
//
//
//
//
//
//
//
//
//
//

## VII. CONCLUSION

38. For all the reasons described above, there is probable cause to believe that ABRAHAMSON violated Title 18, United States Code, Section 2423(b) (Travel with Intent to Engage in Illicit Sexual Conduct).

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this  4th   day of
November, 2024.

_____
HONORABLE A. JOEL RICHLIN
UNITED STATES MAGISTRATE JUDGE